UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**NOEMI IRIZARRY o/b/o A.A.**,                Case Number 1:12 CV 3081

Plaintiff,                                                    Judge Christopher A. Boyko

v.                                              REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

Defendant.                                          Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Noemi Irizarry, on behalf of her minor child A.A., seeks judicial review of the
Defendant Commissioner of Social Security's decision to deny social security income benefits
(SSI). The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). This matter
has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule
72.2 (b)(1). (Non-document entry dated December 20, 2012). For the reasons given below, the
undersigned recommends the Court affirm the Commissioner's decision denying benefits.

### PROCEDURAL HISTORY

On April 21, 2010, Plaintiff filed an application for SSI claiming A.A. was disabled due
to hearing problems, behavioral problems, and sleep apnea. (Tr. 40). Her claim was denied
initially and on reconsideration. (Tr. 37, 46). At Plaintiff's request, a hearing was held before an
administrative law judge (ALJ). (Tr. 62). Plaintiff and A.A., represented by counsel, testified at
the hearing, after which the ALJ found A.A. not disabled. (Tr. 12-25). The Appeals Council
denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 4); 20 C.F.R. §§ 416.1455, 416.1481. On October 26, 2012, Plaintiff filed the instant case. (Doc. 1).

### FACTUAL BACKGROUND

*Disability Reports*

On April 21, 2010, Plaintiff completed a Function Report indicating A.A. wore glasses, had not been fitted for hearing aids, and had no problem communicating. (Tr. 79, 81). She also indicated A.A. had no limitation in his abilities to progress in learning, help himself, cooperate with others, or take care of himself. (Tr. 82-83, 85). She did say A.A. had problems behaving, paying attention, and sticking with a task. (Tr. 84, 86).

Plaintiff completed a questionnaire on June 13, 2010, where she indicated A.A. did not get along with friends or playmates, fought with his brothers, had trouble focusing and finishing chores, received hearing aide support, had an Individualized Education Plan (IEP) at school, took fluoxetine for depression, complained, behaved poorly at school, and fought with his brothers. (Tr. 93-95). She indicated he had no trouble reading or maintaining attention but had some problems remembering what he watched on T.V. and following instructions. (Tr. 95). Plaintiff reported A.A. was overweight, used glasses, had hearing loss since age seven, did not play with other children, could not ride a bike, but could go up and down stairs and walk a block. (Tr. 96).

*Educational Background*

On May 18, 2010, while A.A. was in sixth grade, Lorain City Schools completed an evaluation team report (ETR). (Tr. 161-89). There, Nicole Ralston, Ed.S., NCSP, administered the Universal Nonverbal Intelligence Test (UNIT), and concluded A.A. had a full scale IQ of 96, exceeding forty percent of his peers. (Tr. 169). He had average reasoning, memory, nonverbal problem solving skills, and symbolic quotients, and a low-average non-symbolic quotient. (Tr.

169). Ms. Ralston also administered the Woodcock-Johnson Test of Achievement-III (WJ-III), which revealed A.A. had average reading skills, very low math skills, and low-average writing skills. (Tr. 171-72).

As part of the ETR, A.A.'s teacher, Criss Rhianna, reported A.A. earned a C in her class and had difficulty with reading comprehension, completing assignments on his own, and hearing, but could decode words and read fluently. (Tr. 173, 175, 184). A.A.'s Success for All Reading Level was 5.2. (Tr. 173). Ms. Rhianna also evaluated A.A.'s social-emotional status, indicating A.A. had trouble following instructions but was "generally a well behaved student and interact[ed] well with his peers and teachers." (Tr. 184).

Molly Z. Wilhelm, M.A., CCC-SLP, administered the Test of Language Development – Intermediate 4, which demonstrated A.A.'s language scores were below average. (Tr. 180). Ms. Wilhelm reported A.A. had trouble hearing, poor articulation skills, and typical vocal quality and fluency. (Tr. 181).

Through the third quarter in sixth grade, A.A. earned all F's and D's except for a B in physical education and a C in art. (Tr. 179). In sixth grade language arts, Cynthia A. Fuller reported A.A. had an F because he did not turn in a large project, had trouble brainstorming, wrote run-on sentences, and used incorrect/inconsistent verbs. (Tr. 175-76). A.A.'s math teacher, Mr. Thomas, indicated A.A. had an F in math but did not give up. (Tr. 177). He added A.A. could not do problems on his own, lacked knowledge of even basic math facts, and could not achieve higher than a D because of his low comprehension. (Tr. 177-78).

The ETR team concluded A.A. had hearing loss, average intelligence abilities, basic reading and reading comprehension skills, low-average reading fluency and writing, and very low math calculation and applied problem skills. (Tr. 186). He scored "limited" on the OAT, was

3

socially well-behaved, and needed to be close to the teacher to assist his hearing. (Tr. 186). The team concluded A.A.'s hearing impairment qualified him for special education services. (Tr. 188).

A.A. was placed under an IEP, effective his seventh grade year. (Tr. 207-19). He was referred for evaluation due to an audiology report indicating hearing concerns. (Tr. 208). The IEP indicated A.A. consistently scored in the basic or limited range on the Ohio Achievement Assessments, had normal fine motor skills and gross motor skills, was well-behaved, interacted well with others, and did well when seated close to the teacher. (Tr. 208). He had goals to improve in reading, writing, math, and communication and would receive direct instruction in English and math classes. (Tr. 210-14, 216). By way of accommodations, he was provided preferential seating, a small group setting, extra time, oral directions, repeated and slower paced instruction, and speech therapy for 90 minutes per month. (Tr. 214, 217).

### Nord Center

A.A. received individual and group counseling at the Nord Center from July 2009 through September 2011 from several therapists, including C. Jackosky, M.D. (Tr. 127-49, 207-59, 273-301, 336-56). A.A. reported school and family were his biggest stressors. (Tr. 299, 250, 143, 146). Throughout the sessions, he was consistently honest with his therapists and openly participated in rapport building activities. (Tr. 128-29, 133, 135, 137, 234, 236, 240, 242, 248, 250, 253, 273, 277, 279, 283, 287, 289, 293, 297, 299).

Plaintiff, A.A., and the therapists consistently discussed A.A.'s obesity and the family's struggle to stick to a diet and exercise regimen. (Tr. 129, 133, 238, 240, 244, 275, 337, 339). At one point, A.A. enrolled in Rainbow Babies' Healthy Kids, Healthy Weight program and went to a gym to exercise. (Tr. 128, 253-54). A.A. was honest in telling the therapist he wanted to lose

4

weight, although he did not enjoy exercising. (Tr. 128). Plaintiff mentioned A.A. may have diabetes, but no diagnosis was ever made. (Tr. 128-29, 133).

During therapy, A.A. and Plaintiff consistently said A.A. struggled in school, usually attributing his failure to not turning in work (Tr. 130-31, 135, 137, 236, 238, 275, 291, 297, 338), confusion from changing classes, (Tr. 287, 291), or not getting help from the teacher (Tr. 297, 299). Toward the end of therapy, Plaintiff reported A.A. realized not turning in work was hurting his academic progress. (Tr. 297). For a brief time, A.A. reported he was doing better in school. (Tr. 238, 240, 244, 275, 295). A.A. also reported being teased or bullied at school (Tr. 279, 287, 289, 293, 299, 337) but the number of incidents subsided after Plaintiff spoke to the principal (Tr. 283).

Plaintiff consistently brought up A.A.'s poor behavior at home, such as back talking, arguing, defiance, opposition, not helping around the house, and being disrespectful. (Tr. 130, 147, 236, 238, 253, 273, 277, 285). Generally, A.A. complained of difficulty getting along with his brothers. (Tr. 137, 140, 146, 148-49, 236, 248, 250, 275, 296, 338). Therapists discussed Plaintiff's need to establish a disciplinary system, such as using television and video games as a reward (Tr. 130-31, 141, 145, 149, 253, 273), and suggested A.A. develop coping skills besides video games (Tr. 143). On April 14, 2011, the therapist noted A.A. did not take his medication and was difficult to redirect, hyperactive, and impulsive. (Tr. 283). A week later, the therapist reported A.A. took his medication and was less hyperactive and impulsive. (Tr. 281). At times, the therapists noted A.A.'s anger, behavior, and mood improved. (Tr. 140, 143, 246, 250, 275, 285, 291, 295).

Dr. Jackosky completed an initial psychiatric evaluation at the Nord Center on September 2, 2011,[1] wherein she reported A.A. complained of depression, poor behavior, his dad's death, decreased interest and enjoyment, bullying, low energy, and trouble sleeping. (Tr. 337). She reported A.A.'s history of sleep apnea, obesity, high cholesterol, hypertension, and ruled out diabetes diagnosis. (Tr. 337). On mental status exam, she reported normal findings in the areas of thought content, perception, thought process, mood, affect, behavior, and intelligence. (Tr. 338-39). She also said A.A. smiled and engaged easily; had normal speech; and was easily distracted, fidgety, and borderline diabetic. (Tr. 339). She primarily diagnosed depressive disorder and ruled out ADHD, assigned a global assessment of functioning (GAF) score of 50[2], and prescribed fluoxetine (Prozac). (Tr. 339-40).

***Medical Evidence***

Plaintiff saw pediatrician Arlene Roble, M.D., several times, generally for hypertension, obesity, blood pressure, sugar levels, ADHD, sleep apnea, and atopic dermatitis. (Tr. 303-09). Dr. Roble assigned a body mass index (BMI) of 40.12, which indicates morbid obesity. (Tr. 303).

On January 11, 2010, Beth Kaminski, M.D., wrote to Dr. Roble regarding an obesity evaluation. (Tr. 153). Dr. Kaminski reported A.A. had poor eating habits, problems with portion control, got "virtually no exercise", and watched television multiple hours per day. (Tr. 153). Dr.

---

1. Margaret Messerly, M.D. also signed the evaluation. It is unclear why the "initial psychiatric evaluation" was completed toward the end of A.A.'s Nord Center treatment. (Tr. 340).
2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 41-50 reflects serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *DSM-IV-TR,* at 34.

Kaminski further said A.A. had a good energy level, slept well, did not snore, had frequent colds, wore glasses, and had no problems with hearing or dentition. (Tr. 153). She reported A.A.'s dad died of a myocardial infarction in 2009 and he lived with his mom and three brothers. (Tr. 154). She assigned a BMI of 38.4 (in the 97th percentile), diagnosed obesity and acanthosis nigricans, and recommended A.A. make dietary changes and enroll in the Healthy Kids, Healthy Weight program. (Tr. 154).

On February 18, 2010, Lorain Schools audiologist, Mary K. Westbrook, MA, CCC-A, conducted a hearing evaluation. (Tr. 156). A.A. reported difficulty hearing at school, and Ms. Westbrook diagnosed bilateral peripheral hearing loss of slight to severe degree in his right ear and mild to severe degree in his left ear. (Tr. 159, 166). She concluded A.A. would benefit from amplification. (Tr. 159).

On May 3, 2010, Rosemary Mornoni, M.D., submitted an initial disability determination. (Tr. 197-205). She reported A.A. would benefit from hearing aids, had hearing loss, and twice failed audiology tests at school, "but [could] hear some conversations." (Tr. 198).

Robert Carroll Sprecher, M.D., performed an adenotonsillectomy on September 9, 2010 without complication. (Tr. 268-69). Dr. Sprecher informed Dr. Roble the surgery went well and A.A. no longer snored. (Tr. 325).

On September 15, 2010, A.A.'s pediatric echocardiogram report came back normal. (Tr. 270-71). On September 23, 2010, A.A. underwent a renal ultrasound due to a history of hypertension, which was unremarkable. (Tr. 272).

David Kenagy, M.D., evaluated A.A. for hypertension pursuant to Dr. Roble's referral. (Tr. 358, 360). On March 3, 2011, he determined A.A. had primary hypertension and hyperlipidemia despite A.A.'s claims that he had adhered to a low-sodium diet, was compliant

7

with medication, and performed twenty to thirty minutes of vigorous exercise per day. (Tr. 360). On June 2, 2011, Dr. Kenagy reported A.A. had worsening obesity and acanthosis nigricans in his antecubital fossae and hypertension with unclear adequacy of control. (Tr. 358). However, Dr. Kenagy held off prescribing an antihypertensive with the hope A.A. would improve his diet and exercise regimens. (Tr. 358-59).

### *Testimony*

While in eighth grade, A.A. testified he liked school "[p]retty much sometimes," but would get off task and had trouble hearing his teacher. (Tr. 375). A.A. said even with his hearing aids, he sometimes had trouble hearing. (Tr. 376). He said he was not doing well in his classes and was frequently off task, although he said he enjoyed math and social studies. (Tr. 376-77, 384). He often forgot to take his pills, including on the day of the hearing, although he indicated he was "pretty sure [he was] not out of control" on that day. (Tr. 379). When he did not take his medicine, he fought with his brothers, and he admitted the medicine was helpful. (Tr. 378-80).

A.A. usually finished his homework at school, enjoyed reading mystery books, played with his brothers, practiced math online, played with his dogs, played kickball and football, walked his dogs to the park, played at the park, went to church, and watched television. (Tr. 381-83, 386-89). He said he did not have trouble getting along with others and did not get into trouble at school. (Tr. 391-92).

Plaintiff's testimony was brief, as she generally agreed with A.A.'s statements. (Tr. 392). Plaintiff said she prepared A.A.'s pills for the week, but he often forgot to take them. (Tr. 393). She said A.A. had headaches once or twice a week, was on a diet at home, ate lunch at school, and no longer participated in the Healthy Kids, Healthy Weight program because it was difficult

to get to. (Tr. 393-94). Plaintiff said A.A. was doing well in school this year and medication reduced his symptoms. (Tr. 395-96).

***Consultative Examination***

On September 3, 2010, Thomas F. Zeck, Ph.D., examined A.A. on behalf of the social security administration (SSA). (Tr. 261-64). He noted A.A. had a history of depression, anger management issues, ADHD, hearing impairment, and was under an IEP. (Tr. 261). A.A. also had a history of high blood pressure, possible diabetic condition, and sleep apnea. (Tr. 261). He took Concerta, fluoxetine, and wore hearing aids in both ears. (Tr. 262). A.A. was not in any organized sporting activities, but liked to play pickup games in the neighborhood, rode a bike, and played basketball and hide and seek. (Tr. 263). He also played video games, occasionally went to church, talked back, and was not helpful around the house or an avid television watcher. (Tr. 263). A.A. engaged easily, but was listless and lethargic. (Tr. 263). Dr. Zeck assigned a GAF of 62[3] but indicated he did not administer testing to assess concentration or pace of dealing with tasks or assess cognitive abilities. (Tr. 263-64). He diagnosed ADHD and hearing impairment. (Tr. 263).

***State Agency Review***

At the initial disability determination level, Robelyn Marlow, Ph.D., and John L. Mormol, M.D., reviewed A.A.'s application and determined he had a marked limitation in health and physical well-being due to hearing loss, but noted A.A. was able to hear conversations, interacted with the examiner appropriately, had good word recognition in both ears, and wore

_____

3. A GAF of 61-70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV-TR,* at 34.

9

hearing aids. (Tr. 45). Drs. Mormol and Marlow found less than marked limitations in the domains of attending and completing tasks and interacting and relating with others, and no limitation in the other domains. (Tr. 44). On reconsideration, Teresita Cruz, M.D., and Caroline Lewin, Ph.D., made analogous findings. (Tr. 35-36).

***ALJ Decision***

On November 3, 2011, the ALJ determined A.A.'s only severe impairment was "behavioral problems". (Tr. 15). He determined A.A. did not have an impairment or combination of impairments that met or equaled the listing of impairments, specifically listing 102.10 (regarding hearing loss) or listing 112.11 (regarding ADHD). (Tr. 16). To determine functional equivalence, the ALJ analyzed the record and found A.A. had less than marked limitations in all domains. (Tr. 20-25). The ALJ found A.A. not disabled. (Tr. 25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the

ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR CHILDHOOD DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a)(1).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

A child's SSI claim undergoes a three step review process. 20 C.F.R. § 416.924(a). These

steps determine whether: 1) the child is engaged in substantial gainful activity; 2) there is a

severe impairment or combination of impairments; and 3) the severe impairment, or combination

of impairments, medically or functionally equals the listing of impairments. 20 C.F.R. §§

416.924(a)-(d). Under 20 C.F.R. § 416.926a, "if a child's impairment – or combination of

impairments – does not meet or is not medically equivalent in severity to a listed impairment,

then the Commissioner will assess all functional limitations caused by the impairment to

determine if the child's impairments are functionally equivalent in severity to any of the listed

impairments of Appendix 1" (i.e. "functional equivalency"). *Elam ex rel. Golay v. Comm'r of

Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003).

Functional equivalency is measured under six domains: (i) acquiring and using

information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv)

moving about and manipulating objects; (v) caring for yourself; and, (vi) health and physical

well-being. 20 C.F.R. §§ 416.926a(b)(1)(i-vi). This approach, called the "whole child approach",

accounts for the effects of a child's impairments singly and in combination. *Fleming v. Comm'r

of Soc. Sec.*, 2013 WL 821262, at *5 (N.D. Ohio 2013). Plaintiff must demonstrate marked

limitation in two domains or an extreme limitation in one to find a child disabled. §§ 416.926a(a) & (d).

DISCUSSION

Plaintiff raises the following arguments: 1) the ALJ failed to properly apply the treating physician rule to Dr. Jackosky's opinion; 2) the ALJ failed to properly address the opinions of consultative examiner Dr. Zeck and state agency consultant Dr. Cruz; 3) the ALJ's step-three analysis regarding listing 112.11 (regarding ADHD) is not supported by substantial evidence; 4) standardized testing indicates a "marked" impairment in the domain of acquiring and using information; 5) the ALJ failed to explain the weight given to A.A.'s failure to take medication as part of his attending and completing tasks determination; and 6) the ALJ made improper credibility findings.

Further, in his Reply Brief, Plaintiff argues the Commissioner failed to comply with Local Rule 13.3.1(c)[4] because she did not respond specifically to each issue Plaintiff raised. Where implicated, the undersigned agrees with Plaintiff and affords the Commissioner's failure appropriate weight. However, the undersigned rejects Plaintiff's contention that a failure to follow Local Rule 16.3.1(c) requires finding the unaddressed issues are admitted or require reversal.

### Treating Physician Rule and Opinion Evidence

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188. "Because treating physicians are

---

4. Under Local Rule 16.3.1(c), "defendant shall file a brief which responds specifically to each issue raised by plaintiff, and shall serve it upon the plaintiff."

'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 416.927(c). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p). An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009).

Last, "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc.*

*Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; 20 C.F.R. §§ 416.927(c), (d); SSR 96–6p, 1996 WL 374180, at *2. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F. Supp. 2d at 823-24.

Plaintiff argues the ALJ failed to address treating physician Dr. Jackosky's initial psychiatric evaluation. Plaintiff also argues the ALJ failed to provide good reasons for the weight afforded to the opinions of consultative examiner Dr. Zeck and state agency physician Dr. Cruz. Each doctor is addressed in turn.

Dr. Jackosky[5]

Plaintiff claims the ALJ's decision failed to mention or assign weight to Dr. Jackosky's opinion. (Doc. 13, at 4). The Commissioner indirectly argues harmless error because Dr. Jackosky's opinion was consistent with the ALJ's findings. (Doc. 14, at 14). Upon review, the ALJ indeed failed to assign Dr. Jackosky's opinion weight. Therefore, barring harmless error, remand is required. *See, Blakely*, 581 F.3d 399.

---

5. The Commissioner does not challenge Dr. Jackosky's status as a treating physician. Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.927(c). Moreover, the Commissioner does not challenge that Dr. Jackosky indeed provided an opinion. 20 C.F.R. § 416.927(a)(2) (Medical opinions are defined as "statements from physicians . . . that reflect judgments about the nature and severity of [a claimant's] impairments, including . . . symptoms, diagnosis, and prognosis, what [a claimant] can still do despite the impairments(s), and [a claimant's] physical or mental restrictions.").

Although the Sixth Circuit generally requires reversal and remand where the ALJ fails to assign weight on the record to a treating source's opinion, an exception exists under the harmless error doctrine. *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 750 (6th Cir. 2007); *see also Blakely*, 581 F.3d 399 (holding failure to give good reasons for assigned weight requires remand barring harmless error). Harmless error can occur in three instances: 1) if a "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of [§ 416.927(d)(2)] - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation." *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (citing *Wilson*, 378 F.3d at 547).

As Plaintiff correctly observes, remand is proper if an ALJ fails to even mention a treating source's opinion. *Bowen*, 478 F.3d at 750 (applying the harmless error rule "where the ALJ entirely failed to address the primary treating source's presumptively supportable opinion - plainly risks having the exception swallow up the rule."). However, such is not the case here, inasmuch as the ALJ twice referenced Dr. Jackosky's opinion by exhibit number, 15F. (Tr. 20, 24). Thus, contrary to Plaintiff's argument, the ALJ did not *entirely* fail to discuss Dr. Jackosky's opinion. The issue remains, whether the ALJ's failure to assign weight constitutes harmless error.

In her 2011 psychiatric evaluation, Dr. Jackosky diagnosed depressive disorder; ruled out ADHD; and assigned a GAF score of 50, indicating serious symptoms. (Tr. 339). Plaintiff claims this report is inconsistent with the ALJ's finding that A.A.'s only serious impairment was behavioral problems. (Doc. 13, at 4). The first harmless error exception does not apply because

15

the opinion is not patently deficient. However, the second exception, whether the ALJ effectively adopted the opinion by making findings consistent therewith, merits a closer look. The undersigned addresses Dr. Jackosky's ADHD analysis and depressive disorder diagnosis separately. *See*, SSR 96-5p, 1996 WL 374183, at *4 ("Adjudicators must remember that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one.").

Dr. Jackosky expressly ruled out an ADHD diagnosis, making the opinion generally consistent with the ALJ's findings that ADHD was not a severe impairment. (Tr. 339). Dr. Jackosky considered A.A.'s moderate attention/concentration impairments, and noted A.A. was distractible and fidgety, but engaged easily. (Tr. 338-39). Dr. Jackosky also contemplated A.A.'s complaints of terrible grades, attention problems, lack of focus, and distractibility. (Tr. 338). In determining ADHD was not a severe impairment, the ALJ noted A.A.'s medications were helpful, the state agency examiners' found less than marked limitations in the area of attending and completing tasks, A.A.'s teacher's report saying he never gave up in class, A.A.'s testimony that he cannot focus, and school records including grades and an IEP. (Tr. 17, 19-20). Although both Dr. Jackosky and the ALJ contemplated finding A.A. had a severe impairment of ADHD, both declined to do so for similar reasons.

Next in her opinion, Dr. Jackosky diagnosed depressive disorder. (Tr. 339). Therefore on this issue, the ALJ's findings are not sufficiently consistent. Setting aside the fact a diagnosis is not necessarily an opinion; the ALJ's mention of the diagnosis without assigning weight is harmless under the third exception.

16

The Sixth Circuit has described this third exception as an indirect attack rule which applies in limited circumstances, based on the notion courts are not required to "convert judicial review of agency action into a ping-pong game" where remand would be a "idle and useless formality". *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2005). The Sixth Circuit expanded its explanation in *Nelson v. Comm'r of Soc. Sec.*, a case similar to the one at bar. 195 F. App'x 462 (6th Cir. 2006).

In *Nelson*, the ALJ referred to the opinions of a treating physician by reference, rather than fully explaining why he accorded the opinion little weight. *Id.* at 470. "Nevertheless, the court held that those brief references, which arose in the context of discussing a multitude of contrary medical evidence, met the regulatory goal of addressing the opinions of the treating sources as well as their inconsistency with the record as a whole." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 747, 747-48 (6th Cir. 2007) (citing *Nelson*, 195 F. App'x at 472).

Here, the ALJ indirectly attacked that portion of Dr. Jackosky's opinion which diagnosed depressive disorder. *See*, § 1527. To this end, the ALJ reported A.A.'s medications reduced his symptoms and A.A. had friends, played kickball and football, played with and cared for his dogs, and attended church; all of which attacks consistency with the record. (Tr. 20-21). Further, the ALJ indicated A.A. underwent regular therapy sessions; was on medication to treat depressive disorder; and attended the Nord Center for counseling and medication and anger management; showing the ALJ accounted for limitations imposed by Dr. Jackosy's diagnosis of depression. (Tr. 20, 22). Thus, the ALJ "indirectly attacked" the portion of Dr. Jackosky's opinion regarding depressive disorder, and met the goals of § 416.927(d)(2), despite his failure to assign weight to the opinion as a whole.

17

In sum, the ALJ's findings regarding ADHD are sufficiently consistent with Dr. Jackosky's opinion and his findings regarding depressive disorder met the goals of § 416.927(d)(2). Therefore, the ALJ's failure to assign Dr. Jackosky's opinion weight was harmless.

Dr. Zeck

Plaintiff alleges the ALJ failed to "evaluate Dr. Zeck's opinions that showed impairment" or comply with SSR 09-2p. (Doc. 13, at 11). The Commissioner responds, "[t]he ALJ considered the state agency opinion, as he was required to do, but appropriately declined to adopt it". (Doc. 14, at 18-19).

Dr. Zeck is considered a non-treating source because he examined Plaintiff only once, and did so for purposes of providing a report for Plaintiff's disability claim. 20 C.F.R. § 416.927(e). As a non-treating source, Dr. Zeck's opinion is not entitled to controlling weight. Nevertheless, the opinions of one-time examining sources are weighted under the same factors as treating physicians "including supportability, consistency, and specialization." *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011).

Here, the ALJ afforded Dr. Zeck's opinion "some weight" and concurred with Dr. Zeck's opinion that A.A.'s impairments were severe, but did not meet, medically equal, or functionally equal the listings. (Tr. 17). As support, he pointed to Dr. Zeck's observations that A.A. wore hearing aids, had adequate communication without significant deficits, and participated well in the interview. (Tr. 15). The ALJ's analysis satisfies the good reasons requirement.

First, the ALJ attacked the supportability of Dr. Zeck's opinion by noting Dr. Zeck's ADHD diagnosis was not supported by his report, which indicated A.A. participated well during the interview and had adequate communication. (Tr. 15). Second, Dr. Zeck suggested A.A.'s

18

hearing impairment was responsive to treatment, which is consistent with the ALJ's observations during the hearing, but inconsistent with Dr. Zeck's diagnosis, also attacking the supportability of his opinion. (Tr. 15). Moreover, the ALJ indicated Dr. Zeck's hearing loss diagnosis was inconsistent with the record that A.A.'s hearing loss was treated with amplification. (Tr. 15). In sum, the ALJ satisfied the "good reasons" requirement by attacking the supportability and consistency of Dr. Zeck's opinion.

Additionally, Plaintiff claims the ALJ erred by failing to take note of the fact "children with some impairments (for example, [ADHD]) may be calmer, less inattentive, or less out-of-control in a novel or one-to-one setting, such as a [consultative examination]." (Doc. 13, at 5). However, this section of SSR 09-02P applies only where there is an inconsistency between the record and the interview. SSR 09-02p, 2009 WL 396032, at *11-12 (the language cited by Plaintiff is under *Section VI* of SSR 09-02p, "Resolving Inconsistencies in the Evidence").

The record was consistent with the ALJ's finding that ADHD was not a severe impairment. Indeed, the record consistently showed A.A. built good rapport with therapists, including during group therapy, and was well behaved in school. (Tr. 128-29, 133, 135, 137, 184, 186, 208, 234, 236, 248, 250, 253, 273, 277, 279, 283, 287, 289, 293, 297, 299). A.A. enjoyed reading, practicing math online, watched television, and went to church; activities which require some degree of concentration and focus. (Tr. 381-83, 386-89). His hearing impairment, not inattention, qualified him for special education services. (Tr. 188). Moreover, A.A. and Plaintiff acknowledged A.A.'s medications kept him on task and he attributed his low grades to not turning in work. (Tr. 130-31, 135, 137, 236, 238, 275, 291, 297, 338, 380, 396). In other words, the record is consistent with Dr. Zeck's findings that ADHD was not a severe impairment and SR 09-2p is not implicated.

Dr. Cruz[6]

Plaintiff claims the ALJ "gave no explanation for overruling the State-agency doctors' finding that claimant had a 'marked' limitation in the domain of physical health." (Doc. 13, at 5). The Commissioner argues their finding was inconsistent with the record. (Doc. 14, at 18-19). Like Dr. Zeck, Dr. Cruz is a non-treating source and her opinion is weighted under the same factors as treating physicians "including supportability, consistency, and specialization." *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011).

To explain why A.A. had less than marked limitation in the domain of health and physical well-being, the ALJ pointed to several facts from the record thereby challenging the consistency of Dr. Cruz' opinion. Indeed, the ALJ noted A.A. attends counseling and medication management appointments, reported no medication side effects, had a good energy level, blood pressure within the upper limit of normal, normal blood work, and was placed on a diet and exercise regimen rather than an antihypertensive. (Tr. 15-16, 18, 25). Moreover, the ALJ pointed to A.A.'s testimony that he played basketball, kickball, and football. (Tr. 16). Regarding hearing loss, the ALJ indicated A.A. wore hearing aids, had clear communication with no significant deficits, and participated well in the state agency interview and ALJ hearing. (Tr. 15).

Based on all of this, the ALJ provided good reasons for affording Dr. Cruz's opinion limited weight by attacking the consistency of her opinion with the record as a whole.

***Step-Three Analysis of Listing 112.11***

---

6. In his brief, Plaintiff specifically takes issue with the ALJ's failure to provide any reason for his rejection of Dr. Cruz's opinion regarding physical health. (Doc. 13, at 6). However, it should be noted that an analysis of the other state agency examiners' opinions would mirror the analysis of Dr. Cruz's opinion, because their findings regarding the listings are analogous. (*Compare* Tr. 44-45 *with* Tr. 35-36).

Plaintiff argues the ALJ was required to compare the evidence of record to listing 112.11 to enable meaningful review. (Doc. 13, at 6-7). The Commissioner does not argue whether A.A.'s impairment or combination of impairments meets or medically equals listing 112.11. (Doc. 14). Rather, the Commissioner's response is limited to a discussion of functional equivalency.

The listing of impairments is used at the third step of the disability determination process to determine whether a claimant is disabled. *Reynolds v. Comm'r of Soc. Sec*., 424 Fed. App'x 411, 414 (6th Cir. 2011). If a claimant meets the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 416.926(a). If not, the sequential evaluation process continues and the ALJ must determine whether a claimant's impairment or combination of impairments is the "medical equivalence" of a listed impairment. *Id*. An impairment is equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." *Id*. An ALJ must compare medical evidence with the requirements for listed impairments at step three. *Id.*; *May v. Astrue*, 2011 WL 3490186, at *7 (N.D. Ohio 2011).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006)). However, the court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6 (citing *Reynolds*, 424 Fed. App'x at 415-16); *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its

21

entirely to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 Fed. App'x at 411).

In order to show that a child meets listing 112.11 (regarding ADHD), a plaintiff must present medically documented findings of all three of the following: 1) marked inattention; 2) marked impulsiveness; and 3) marked hyperactivity. *Davis v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 174787, at *29 (N.D. Ohio 2012); 20 C.F.R. Pt. 404, Supbpt. P, App. 1, Listing 112.11(A). After satisfying the medical documentation requirement, a plaintiff must show the child, at the time of applying for SSI and at the time of the ALJ's decision, exhibited a least two of the following criteria:

> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age six, by appropriate tests of language and communication; or
>
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
>
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>
> d. Marked difficulties in maintaining concentration, persistence, or pace.

*Davis*, 2012 U.S. Dist. LEXIS 174787, at *30-31; Pt. 404, Supbpt. P, App. 1, Listing 112.2(B)(2). Tellingly, Plaintiff does not point to any evidence to support finding A.A.'s

symptoms meet or medically equal listing 112.11, as defined above. Nevertheless, the undersigned proceeds with review of the ALJ's analysis.

Here, the ALJ stated, "[f]our State Agency medical consultants reviewed the claimant's file and concluded that the claimant's impairment or combination of impairments is severe but does not meet or medically equal any of the listings []." (Tr. 16). Thus, the ALJ concluded, "[t]he evidence supports this conclusion." (Tr. 16). This lone, general statement is clearly inadequate.

However, the Court is to consider the ALJ's opinion in its entirety and the ALJ need only provide enough evidence to enable meaningful review. Throughout his opinion, the ALJ provided several paragraphs of evidence to support his finding regarding listing 112.11. The issue is whether this constitutes substantial evidence for his step three conclusions. The Court finds it does.

The ALJ referenced the state agency examiners' opinions, who found A.A. had less than marked limitations in the domains of attending and completing tasks. (Tr. 17, *supported by*, Tr. 36, 44). The ALJ also considered A.A.'s and Plaintiff's testimony, that he gets off task but his medications helped when he remembered to take them. (Tr. 17, *supported by*, Tr. 378-79). The ALJ indicated A.A. had a full-scale IQ of 96; average to low-average grades, probably caused by his hearing trouble; and his teacher's report that A.A. did not give up. (Tr.19-20, *supported by*, Tr. 169, 171-72, 177). The ALJ also pointed to A.A.'s counselor's notes that he was difficult to redirect, hyperactive, and impulsive without medication, but his symptoms subsided when he took his mediation. (Tr. 20, *supported by*, Tr. 281, 283).

Based upon his recitation of this evidence, the Court finds that the ALJ's analysis was sufficient to enable meaningful review of his finding that A.A.'s ADHD did not meet or medically equal listing 112.11, and his decision is supported with substantial evidence.

23

*Acquiring and Using Information*

Concerning the domain of acquiring and using information, Plaintiff argues the ALJ's decision was insufficient because it failed to mention two tests included in A.A.'s ETR; namely, a Listening and Spoken Language test (Tr. 180-81) and a Calculation and Applied Problems test (Tr. 171-72). The Commissioner does not specifically address this argument, but instead argues the ALJ "reasonably determined that Claimant had a less than marked limitation in attending and completing tasks." (Doc. 14, at 15).

The domain of acquiring and using information addresses how well a child is able to learn and use information. 20 C.F.R. § 416.926a(g). The regulations describe this domain for school-aged children (age 6 to 12), A.A.'s age bracket at the time his application was filed:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv). For A.A.'s age bracket at the time of the hearing, referred to as adolescents (age 12 to 18), the regulations set forth:

> In middle and high school, you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas).

24

20 C.F.R. § 416.926a(g)(2)(v).

A marked limitation in this domain may be demonstrated by "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and . . . day-to-day functioning in domain-related activities is consistent with that score. § 416.926a(e)(2)(iii). Alternatively, marked limitation is shown "in a domain when [the child's] impairment(s) interferes seriously with his ability to independently initiate, sustain, or complete activities." § 416.926a(e)(2)(i).

Regarding consideration of test scores, the Code sets forth, "we will not rely on any test score alone. No single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 834 (6th Cir. 2009) (quoting 20 C.F.R. § 416.926a(e)(4)(i)). Furthermore, the Commissioner is to consider test scores together with other information regarding function, "including reports of classroom performance and the observations of school personnel and others." § 416.926a(e)(4)(ii). In fact, the Commissioner may find that a claimant does not have a "marked" or "extreme" limitation, even if a claimant's test scores satisfy the requisite levels, "if other information in [claimant's] case record shows [his] functioning in day-to-day activities is not seriously or very seriously limited by [his] impairment(s)." § 416.926a(e)(4)(ii)(B). It is the responsibility of the Commissioner to resolve any discrepancies between a test score and the record as a whole. § 416.926a(e)(4)(iii).

Here, the ALJ pointed to a wide variety of evidence to support his finding in this domain. Specifically, the ALJ noted A.A.'s IQ score of 96; average to low-average reading, writing, and math skills; hearing problem and treatment; IEP; grades ranging from B to F; and enjoyment of

reading and practicing math online. (Tr. 19). In short, the ALJ appropriately evaluated A.A.'s abilities to acquire and use information by considering "other information regarding function". § 416.926a(e)(4)(ii).

Furthermore, his decision is supported by substantial evidence. Indeed, no state examiner found A.A. had any limitation in acquiring or using information. (Tr. 35-36, 44). A.A. had a full scale IQ of 96, which exceeded forty percent of individuals his age, and average reasoning, memory, nonverbal problem skills, and symbolic quotients. (Tr. 169). Moreover, A.A. scored in the average range on the WJ-III, except for scoring low-average in math. (Tr. 171-72). And while A.A. had some trouble with reading comprehension, he scored near grade level on the Success For All Reading Level scale. (Tr. 173, 175, 184). In addition, the ETR team concluded A.A. had average intelligence abilities and basic reading and comprehension skills, despite low-average fluency and writing and very low math calculation and applied problem skills. (Tr. 186). Nevertheless, the team qualified him for special education based on his hearing impairment. (Tr. 188). On mental status exam, Dr. Jackosky reported normal findings in the areas of thought content, perception, thought process, mood, affect, behavior, and intelligence. (Tr. 338-39).

A.A. clearly has some limitation in this domain. However, in light of the deference inherent in our standard of review, the ALJ's finding that A.A. had less than marked limitations in the acquiring and using information domain is supported by substantial evidence.

### Attending and Completing Tasks

Plaintiff argues the ALJ erred when he failed to find a marked impairment in the domain of attending and completing tasks. (Doc. 13, at 9). Specifically, Plaintiff argues the ALJ committed reversible error by not addressing whether A.A. was denied benefits because he failed to take his medication; or to explain whether his decision was based on A.A.'s condition while

26

he was on medication. (Doc. 13, at 9). Plaintiff cites *Hernandez v. Astrue*, as support. (Doc. 13, at 9); 2011 U.S. Dist. LEXIS 118601 (N.D. Ohio 2011), *report and recommendation adopted*, 2011 U.S. Dist. LEXIS 118598. The Commissioner does not distinguish or otherwise address *Hernandez* in her brief.

In *Hernandez*, the ALJ noted the claimant's failure to take his medication in several sections of his decision. 2011 U.S. Dist. LEXIS 118601, at *16. However, "[t]he ALJ did not explain if his conclusions that [c]laimant's limitations were less than marked in the two domains were based on [c]laimant's condition while he was taking medication or [c]laimant's condition while he was not on medication." *Id.*, at *17. Moreover, "the ALJ never expressly addressed whether [the] [c]laimant was denied benefits because he failed to take his medication." *Id*. Relying on SSR 82-59, the court in *Hernandez* held that regardless of whether the ALJ's findings were supported by substantial evidence, the "ALJ failed to explain sufficiently the impact of [c]laimant's non-compliance, thus preventing any meaningful review." *Id.*, at 20. Alternatively, the court remanded because the ALJ did not ask the plaintiff or claimant whether there was a good reason for failure to follow prescribed treatment. *Id*.

Of importance, SSR 82-59 relied on by *Hernandez*, only applies to an individual "who would otherwise be found to be under a disability, but who fails without justifiable cause to follow[] treatment prescribed by a treating source." SSR 82-59, 1982 WL 31384, at *1; *Hester v. Sec'y of Health and Human Servs.*, 886 F.2d 1315 (6th Cir. 1989). In other words, SSR 82-59 does not prohibit an ALJ from using evidence of noncompliance as a factor in analyzing a claimant's credibility. *Ranellucci v. Astrue*, 2012 WL 4484922, at *11 (M.D. Tenn. 2012); *Kinter v. Colvin*, 2013 WL 1878883, at *9 (N.D. Ohio 2013) ("courts in this Circuit have found [SSR 82-59] inapplicable in cases where the ALJ has considered the noncompliance as only one

27

factor in assessing a claimant's credibility or in cases where no prior disability ruling was made by an ALJ that was thereafter undone by a claimant's noncompliance with treatment recommendations."), *report and recommendation adopted*, 2013 WL 1869661.

Thus, the relevant issue encompassing the ALJ's use of "noncompliance" is whether the ALJ's credibility analysis is supported by substantial evidence. For the following reasons, the undersigned recommends finding it is.

### Credibility

Plaintiff claims the "ALJ failed to make a reviewable credibility finding for [A.A.] and his mother." (Doc. 13, at 8). In a footnote, the Commissioner rejects Plaintiff's argument because the ALJ devoted "eight pages of his decision explaining, in his detailed analysis of the six functional domains, why [A.A.'s] subjective allegations regarding the intensity, persistence, and limiting effects of his symptoms were only partially credible." (Doc. 14, at 19 n.5).

Credibility determinations must be "grounded in the evidence and articulated in the determination or decision." SSR 96-7P, 1996 WL 374186, at *4. "The ALJ may not 'make a single conclusory statement that . . . 'the allegations are (or are not) credible.'" *Saddler v. Commissioner of Social Sec.*, 1999 WL 137621, at *2 (6th Cir. 1999) (quoting SSR 96-7P, 1996 WL 374186, at *1.). If the ALJ rejects testimony as not credible, he must give reasons for doing so. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). "The determination . . . must contain specific reasons for the finding on credibility . . . and must be sufficiently specific to make clear . . . the weight the [ALJ] gave to the individual's statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186, at *2. When the claimant is a child under the age of eighteen and cannot adequately describe his or her symptoms, the ALJ is required to accept the testimony of the person most familiar with the child's condition. 20 C.F.R. § 416.928(a).

28

Here, the ALJ found Plaintiff's and A.A.'s testimony not credible to the extent it was inconsistent with the finding that A.A. does not have an impairment or combination of impairments that functionally equals the listings "for the reasons explained below." (Tr. 17). To this end, the ALJ found Plaintiff's claims that A.A. could not pay attention partially credible because A.A. said he liked to read and practice math problems online. (Tr. 19). Similarly, Plaintiff's claims that A.A. had behavioral problems were partially credible because although A.A. could be oppositional toward Plaintiff, A.A. had friends, played kickball and football, cared for dogs, went to church, and behaved at school. (Tr. 21-22). With respect to moving and manipulating objects, the ALJ compared Plaintiff's claims that she had to force him to go outside to engage in other activities with the fact A.A. like to watch television and played basketball, football, and kickball. (Tr. 23). In the domain of ability to care for self, the ALJ compared Plaintiff's claims that she watched A.A.'s diet and/or stuck to an exercise and diet regimen at home with her testimony that she did not know what A.A. ate at school and he would hide and eat. (Tr. 24). Finally, in the domain of health and physical well-being, the ALJ discredited Plaintiff's claims that A.A. had marked impairments because he did not report any side effects from his medication, which the ALJ found to be effective. (Tr. 25).

Of Importance, the standard for credibility is that the reasons an ALJ gives must be specifically sufficient to make clear the weight he assigned. Although the ALJ could have been more explicit, his reasons for finding A.A.'s and Plaintiff's testimony partially credible are sufficiently clear.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner applied the correct legal standards and made determinations

supported by substantial evidence. Therefore, the undersigned recommends the decision of the Commissioner be affirmed.

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).